**Wendi Marie DAVILA, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 05–07–00207–CR.**

Court of Appeals of Texas, Dallas.

April 30, 2008.

Christian T. Souza, Asst. Public Defender, Dallas, for Appellant.

Kristin C. Hagge, Asst. Dist. Atty., Dallas, for the State.

Before Justices FITZGERALD, LANG–MIERS, and MAZZANT.

**OPINION**

Opinion by Justice LANG–MIERS.

Appellant was convicted of aggravated sexual assault of her daughter and sentenced to fifteen years in prison. Appellant raises three issues on appeal. In her

first two issues, appellant complains about the trial court's ruling striking two prospective jurors for cause. In her third issue, appellant argues that the evidence is factually insufficient to prove penetration. We overrule appellant's three issues and affirm the trial court's judgment.

## THE TRIAL COURT'S RULING STRIKING TWO PROSPECTIVE JURORS FOR CAUSE

Appellant's first and second issues complain about the trial court's decision to grant motions by the State to strike two jurors for cause. In her first issue, appellant argues that the trial court abused its discretion when it struck "two qualified venire members on the grounds that they lacked adequate ability to read and write." In her second issue, appellant argues that "[t]he trial court erred by applying an incorrect legal standard to sustain the State's challenges for cause" concerning the same two prospective jurors.

### A. Applicable Law

■ "A challenge for cause is an objection made to a particular juror, alleging some fact which renders the juror incapable or unfit to serve on the jury." TEX. CODE CRIM. PROC. ANN. art. 35.16(a) (Vernon 2006). One of the grounds upon which a party may challenge a prospective juror for cause is that "the juror cannot read or write." *Id.* art. 35.16(a)(11). "[A] limited ability to read and write will not meet the literacy requirement for qualification as a juror." *Goodwin v. State*, 799 S.W.2d 719, 736 (Tex.Crim.App.1990). Instead, the requirement contemplates that the prospective juror "can express his ideas in writing." *Id.* (quoting *Hernandez v. State*, 506 S.W.2d 884, 887 (Tex.Crim.App.1974)).

### B. Standard of Review

When reviewing a trial court's decision to grant or deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the court's ruling. *Feldman v. State*, 71 S.W.3d 738, 744 (Tex.Crim.App.2002). We give great deference to the trial court's decision on a challenge for cause because the trial judge is in the best position to evaluate the prospective juror's demeanor and responses. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex.Crim.App.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1446, 170 L.Ed.2d 278 (2008). Particular deference is given when the potential juror's answers are vacillating, unclear, or contradictory. *Feldman*, 71 S.W.3d at 744. The trial court's ruling on a challenge for cause will not be reversed absent a clear abuse of discretion. *Saldano*, 232 S.W.3d at 91.

### C. Relevant Facts

Towards the beginning of the voir dire examination, the State asked prospective juror Laura Monsivais a question about the language of the indictment, and she responded by stating "I don't understand English real well." The State asked whether any of the other prospective jurors "feel the same way ... cannot read and write the English language." Two prospective jurors responded: Genaro Valencia raised his hand, and Gregory Miller said "I feel the same way." The trial court later excused the other prospective jurors for lunch, but asked Monsivais, Valencia, and Miller "to stay back from lunch, if you would, just for a few minutes."

After additional questioning, the parties and the trial court agreed to excuse Monsivais. The State questioned Miller next:

[THE STATE]: Mr. Miller, you said you had some problems with reading and writing the English language. I don't mean to embarrass you or anything. We just have to ask the questions. I appreciate you speaking up. What exactly is the problem?

[MILLER]: Well, it's my first time. I'm really not comfortable with answering the questions and stuff.

[THE STATE]: Okay. Have you been able to understand everything that I have said? Have you had trouble understanding it?

[MILLER]: Some of it, I had trouble. Pretty much most of it, I understand.

[THE STATE]: Okay. But there's still some things that you're having trouble with?

[MILLER]: Yes.

[THE STATE]: Can you read the English language?

[MILLER]: Not much.

[THE STATE]: So there's some words that you can read but others you cannot?

[MILLER]: Yeah.

[THE STATE]: What about writing, sir?

[MILLER]: I can write a little bit. I mean, I'm not too good at that either.

[THE STATE]: Can you write a little bit better than you can read, I guess?

[MILLER]: About the same.

After this questioning, the State moved to strike Miller for cause and appellant's counsel questioned Miller:

[APPELLANT'S COUNSEL]: You can't read—I mean, I can't read some medical books, but I can read Sports Illustrated. You read Sports Illustrated at all?

[MILLER]: Yeah.

[APPELLANT'S COUNSEL]: You work as a machinist, is that right?

[MILLER]: No. I work at CVS.

[APPELLANT'S COUNSEL]: What do you do?

[MILLER]: Actually, I'm a supervisor at night.

[APPELLANT'S COUNSEL]: I know this is no fun, and lawyers talk fast. We talk in big words. We've asked you questions that you probably never heard before. Is that some of the problem that you have had following it?

[MILLER]: That, too. Yeah.

[APPELLANT'S COUNSEL]: Now, the Judge is going to have the law written down for you in page form. He'll explain certain legal terms in human-being language. Just like you follow the directives of your supervisor at CVS ... you can' try and go through that, is that right?

[MILLER]: Yeah.

After this questioning, appellant's counsel opposed the State's motion to strike and the trial court questioned Miller:

THE COURT: Mr. Miller, how far did you go in school?

[MILLER]: Actually, I went to the ninth.

THE COURT: Okay. Have you filled out lease forms, like, rent an apartment or bought a car, where you filled out a lease agreement?

[MILLER]: Actually, it's been awhile back. Well, actually, my wife, she pretty much help me fill it out.

THE COURT: What about job applications? I'm sure you've filled out job applications.

[MILLER]: Yeah, I have did that before.

THE COURT: Did you understand all the questions on the job application?

[MILLER]: Not quite.

THE COURT: Is this a matter of—a job application is a one-page document, generally. It ask[s] your background. Are there lines that you left blank, because you couldn't understand them?

[MILLER]: Actually, I always had help.

THE COURT: You always had help with it?

[MILLER]: Yeah.

After this questioning, the trial court granted the State's motion to strike. Appellant's counsel objected to that ruling and stated "I don't think these folks have to be high school graduates or anything else to be on a panel. I think he's entitled to be a juror as much as anybody."

The State questioned Valencia next:

[THE STATE]: Mr. Valencia, you were saying that you had trouble reading and writing the English language.

[VALENCIA]: Yeah. I go only couple months in school.

[THE STATE]: Okay. Have you been able to understand what I've said today?

[VALENCIA]: No.

[THE STATE]: Okay. How long have you lived in the United States?

[VALENCIA]: Nineteen years.

[THE STATE]: Okay. And you still have trouble reading and writing the English language?

[VALENCIA]: Yeah.

After this questioning, the State moved to strike Valencia for cause and appellant's counsel questioned Valencia:

[APPELLANT'S COUNSEL]: Sir, did you say that you were a citizen?

[VALENCIA]: Yes, sir.

[APPELLANT'S COUNSEL]: Have you voted? Have you ever voted?

[VALENCIA]: Citizenship.

[APPELLANT'S COUNSEL]: Have you ever voted in an election? Have you ever voted for the President?

[VALENCIA]: Yeah.

[APPELLANT'S COUNSEL]: Did you vote in the presidential election?

[VALENCIA]: Yeah, I vote.

[APPELLANT'S COUNSEL]: I'm not going to ask you who you voted for. Have you ever filled out a job application?

[VALENCIA]: Yes.

[APPELLANT'S COUNSEL]: Was it in English or in Spanish, sir?

[VALENCIA]: English.

[APPELLANT'S COUNSEL]: And you got through that, is that right? You finished it, correct?

[VALENCIA]: Yeah.

The State asked Valencia about his jury questionnaire:

[THE STATE]: What does this say, sir?

[VALENCIA]: My espousa is in Mexico.

[THE STATE]: What does that mean?

[VALENCIA]: House and kids.

[THE STATE]: Do you know what this signature line is on the bottom of your jury card?

[VALENCIA]: No.

The State asked the trial court to "[l]et the record reflect the State just showed the signature box for donations to the juvenile department, Foster Care system" and reurged its motion to strike Valencia for cause. Appellant's counsel objected, stating "I don't believe people need to be ace readers. I don't think that's a valid test, to see if someone can read or not." The trial court then asked Valencia if he knew "what a presumption is" and Valencia answered "No. I don't know." The trial court granted the State's motion to strike and stated "I don't think this [prospective juror] would get through the Court's Charge, fully understanding everything it says." The trial court noted appellant's counsel's objection to that ruling.

### D. Analysis

In her brief, appellant combines her argument concerning her first two issues. Appellant argues that the trial court "applied an overly restrictive standard" when it excused Miller and Valencia as prospective jurors on the ground that they could not adequately read and write. The crux of appellant's argument is that Miller and Valencia "read and wrote well enough to

serve [as jurors]." We will separately address appellant's arguments about the propriety of the standard applied by the trial court and the decisions to grant the State's motions to strike Miller and Valencia.

### 1. Literacy Standard Applied by the Trial Court

Appellant argues that the trial court "applied an overly restrictive standard" and required prospective jurors "to read to an advanced degree." In response, the State argues that "nothing in the record" supports appellant's contention that the trial court required prospective jurors to "read to an advanced degree." Instead, the State contends that "[t]he trial judge's questions show that he was trying to assess whether Miller or Valencia could read and write English well enough to communicate their ideas in writing." We agree with the State. The record does not demonstrate that the trial court applied an improperly heightened literacy requirement to the prospective jurors. We overrule appellant's second issue.

### 2. Prospective Juror Miller

■ Appellant argues that Miller met the literacy requirement to serve as a juror because Miller "routinely reads magazines, follows written instruction in his work as a supervisor at CVS pharmacy, and writes as well as he reads." In response, the State argues that appellant mischaracterizes the record and that the record supports the trial court's ruling.

The record does not indicate, as appellant argues, that Miller "routinely reads magazines." Instead, Miller answered "[y]eah" when asked "You read Sports Illustrated at all?" This exchange does not demonstrate the frequency or level of comprehension with which Miller reads magazines. Likewise, Miller did not state that he follows written instructions at work. Instead, Miller answered "[y]eah" when asked if he could "try and go through" the jury charge "[j]ust like you follow the directives of your supervisor at CVS." This exchange does not demonstrate that Miller could follow written instructions. On the contrary, Miller answered "[n]ot much" when asked if he could read English. He also stated that he writes English as well as he reads it. And he stated that he "always had help" filling out job applications, and that his wife "pretty much help[s]" him fill out rental and lease agreements. The record does not demonstrate that Miller "can express his ideas in writing." *Goodwin*, 799 S.W.2d at 736. Consequently, we cannot conclude that the trial court clearly abused its discretion in granting the State's motion to strike Miller for cause.

### 3. Prospective Juror Valencia

■ Appellant argues that Valencia met the literacy requirement to serve as a juror because Valencia "votes in presidential elections and completes job applications in English without assistance." Appellant also argues that "[t]here was no evidence to support the implied finding that Valencia cannot write English except Valencia's unfamiliarity with the option of using his Juror Information Card to donate his jury service payment to charity." In response, the State argues that appellant mischaracterizes the record and that the record supports the trial court's ruling.

The record does not indicate, as appellant argues, that Valencia completes job applications in English "without assistance." Valencia was not asked whether he had assistance in completing job applications. Valencia stated that he "go only couple months in school." Valencia also stated that he did not understand a portion of his jury questionnaire. The record does not demonstrate that Valencia "can express his ideas in writing." *See Goodwin*, 799 S.W.2d at 736. Consequently, we cannot conclude that the trial court clearly

abused its discretion in granting the State's motion to strike Valencia for cause.

We overrule appellant's first issue.

### FACTUAL SUFFICIENCY OF THE EVIDENCE CONCERNING PENETRATION

In her third issue, appellant argues that the evidence was factually insufficient to prove penetration as alleged in the indictment. The crux of her argument is that complainant's testimony was not credible.

### A. Applicable Law

A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means" and the victim is under fourteen years old. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B) (Vernon Supp.2007). Penetration, within the meaning of section 22.021 of the penal code, includes any penetration passing beyond the folds of the outer vaginal lips. *Karnes v. State,* 873 S.W.2d 92, 96 (Tex. App.-Dallas 1994, no pet.) (citing *Vernon v. State,* 841 S.W.2d 407, 409–10 (Tex.Crim. App.1992)).

### B. Standard of Review

In reviewing the factual sufficiency of the evidence, we view all of the evidence in a neutral light to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Watson v. State,* 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). To reverse a case on a factual-sufficiency challenge, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* at 417. In a factual-sufficiency review, we are permitted to substitute our judgment for the jury's when considering credibility and weight determinations, but only to a very limited degree. *Marshall v. State,* 210 S.W.3d 618, 625 (Tex.

Crim.App.2006) (factual-sufficiency jurisprudence requires appellate court to afford due deference to jury's determinations), *cert. denied,* —— U.S. ——, 128 S.Ct. 87, 169 L.Ed.2d 66 (2007). Unless the record clearly reveals a different result is appropriate, we must defer to the fact-finder's determination concerning what weight is to be given to contradictory testimony. *Johnson v. State,* 23 S.W.3d 1, 8 (Tex. Crim.App.2000). We measure the factual sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Fuller v. State,* 73 S.W.3d 250, 252 (Tex.Crim.App.2002).

### C. Relevant Facts

Complainant was fourteen years old when she testified at appellant's trial. She was called as a witness by the State and by appellant. Complainant testified that, when she was ten years old, she and appellant drank strawberry tequila and took a bath together. Appellant asked complainant to get out of the tub and "go get the purple thing out of the purple bag." Complainant identified the "purple thing" as a vibrator marked as State's exhibit 5. Complainant returned to the bathtub. Appellant asked complainant to get out of the bathtub again to "get the vaseline." When complainant returned to the bathtub, appellant told complainant to sit on a stool near the bathtub. Appellant put vaseline on complainant's vagina and "turned the vibrator on and stuck it in [complainant]." Complainant described the noise the vibrator made as "something like the vibration of a cell phone." Complainant asked appellant to stop and told her it hurt. Appellant apologized. Appellant turned the vibrator off and asked complainant "[w]ould it be better if I did it with my finger?" Complainant said "no," but appellant "did it anyways." Appellant put her "pointer finger" inside complainant's vagina "fingernail deep." Complainant

demonstrated for the jury how appellant moved her finger in complainant's vagina "very little [ ] in a circular position." Appellant said "I'm sorry" and "everything went normal." Appellant washed her hair and complainant washed her body. Appellant exited the bathtub first. Complainant watched as appellant went into the adjoining bedroom, took her towel off, joined her fiance on the bed, and "started sucking his penis." Complainant was "[d]isgusted." Appellant's fiance asked complainant to join them on the bed, but complainant said no and closed the bathroom door.

When complainant left the bathroom, appellant had a nightgown on and was sitting on the edge of the bed. Complainant went and sat in front of appellant. Appellant put her finger inside complainant's vagina again. Complainant pushed appellant's hand away and got up from the bed.

Complainant was asked whether she remembered any other times when her mother's hand "went into [her] private part." She initially answered "no," but then testified that "[t]here was another time whenever I was drying off and she came up on the side of me and she put her finger inside of me again. And then— that's whenever I put my leg down, and she pulled it out." She was asked if that was on a different day than the events she previously described and she could not remember. Complainant testified that she could not remember the first time her mother touched her, but it happened "[a]bout three" times, "in the bedroom or the bathroom."

After appellant was arrested, appellant's maternal grandmother told complainant that complainant could get her mother out of jail by telling appellant's attorney that it was appellant's fiance who sexually as- saulted complainant. After complainant met with appellant's lawyer, the lawyer told the prosecutor what complainant said and the prosecutor told complainant's father. Complainant's father confronted her, and she confessed that she had lied to appellant's lawyer. Complainant testified that she knew it was wrong to lie but wanted appellant out of jail. Complainant felt guilty about appellant's arrest and wrote apology letters to her mother in jail.

Complainant's babysitter and therapist both testified that complainant had told them about the sexual assault and that they believed her. Complainant's paternal grandmother testified that complainant has a history of dishonesty about "school work" and "typical kid issues," but that she had no doubt that complainant was telling the truth about being sexually molested by her mother.

### D. Analysis

■ Appellant was charged with using her finger to penetrate her daughter's sexual organ.[1] Appellant essentially contends that complainant's testimony was not credible because complainant (1) was in the middle of a custody battle, (2) gave inconsistent testimony, and (3) recanted "as the trial date approached."

Complainant testified about being penetrated by appellant's finger. Multiple witnesses testified that complainant reported appellant's conduct to them and that they believed complainant. Although some of complainant's testimony was inconsistent, "[i]t is the sole province of the jury to weigh the credibility of the witnesses and testimony." *Schmidt v. State*, 232 S.W.3d 66, 68 (Tex.Crim.App.2007). The jury may believe or disbelieve all or part of any witness's testimony. *Jones v.*

---

**1.** The State agreed to a jury charge on the sole theory of penetration with appellant's finger.

*State,* 984 S.W.2d 254, 258 (Tex.Crim.App. 1998). Courts give wide latitude, in particular, to testimony given by child victims of sexual abuse. *See, e.g., Villalon v. State,* 791 S.W.2d 130, 134 (Tex.Crim.App.1990) (courts cannot expect child victim to testify with same clarity and ability as mature, capable adult).

Viewing the evidence in a neutral light, we conclude that the evidence is factually sufficient to support the jury's finding of penetration with appellant's finger. The evidence was not so obviously weak that appellant's conviction is clearly wrong and manifestly unjust, nor does the great weight and preponderance of the evidence contradict the jury's verdict. *See Marshall,* 210 S.W.3d at 625 (evidence is "factually insufficient when the verdict 'seems clearly wrong or manifestly unjust' or 'against the great weight and preponderance of the evidence' ") (citing *Watson,* 204 S.W.3d at 414–15). We overrule appellant's third issue.

## Conclusion

We overrule appellant's three issues and affirm the trial court's judgment.